# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

*THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28 (4) (c), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS AUTHORITY IN ANY OTHER CASE IN ANY COURT OF THIS STATE.*

RENDERED: JUNE 15, 2006
NOT TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

2005-SC-0803-WC

DATE 7-6-06 Emec Growth, D.C.

PHYLLIS JUSTICE                    APPELLANT

APPEAL FROM COURT OF APPEALS
V.                          2005-CA-0678-WC
WORKERS' COMPENSATION NO. 01-66638

COMMUNITY TRUST BANK; HON.
MARCEL SMITH, ALJ; AND WORKERS'
COMPENSATION BOARD                    APPELLEES

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

An Administrative Law Judge (ALJ) dismissed the claimant's application for benefits based on findings that the work-related fracture to her left third metacarpal bone had healed; that left carpal tunnel syndrome was not work-related; and that any headaches, neck pain, or back pain the injury might have caused had resolved. The Workers' Compensation Board and the Court of Appeals affirmed. Appealing, the claimant asserts that the ALJ erred by basing the decision regarding the headaches, neck pain, and back pain on a flawed medical opinion. We affirm.

The claimant was injured on November 30, 2001, when she fell down some stairs at work. She testified that she fell head first and attempted to break the fall with her left hand. Her hand hit the bottom step, and the left side of her forehead hit the landing. She was taken by ambulance to the hospital and underwent x-rays of the left

wrist, forearm, and hand; left leg; and cervical spine. They revealed only a fracture of the long metacarpal bone in her left hand, which was placed in a splint. She also saw her family physician, Dr. Bhatraju, who later referred her to Dr. Lyons and Dr. Ahmed.

The claimant returned to part-time work in March, 2002 and progressed to full-time work about a month later. She quit working in February, 2003, when she underwent surgery on her left wrist for carpal tunnel syndrome, and did not return thereafter. She was terminated in August, 2003. When deposed in January, 2004, she complained that since the injury she had experienced headaches at the point where the left side of her forehead was injured, pain in her neck that extended into her shoulder, pain in her low and mid back on the left side, and symptoms in her left hand that included pain at the carpal tunnel incision site.

Dr. Ahmed, a board-certified neurologist, began treating the claimant on March 26, 2002. At that time, she complained of headache, neck pain, upper left extremity weakness, low back pain, and numbness in the left leg since a fall down a flight of steps. As of July 21, 2003, she continued to have problems with her left hand, although it had improved. She also continued to have intermittent headaches (about three times per week), which was less frequent than before she began taking Topamax. Her neck pain continued to radiate into the left upper extremity, but pain in the mid back had improved. On September 30, 2003, she described her neck pain and headaches as being significantly better. The three-page report did not mention back or shoulder pain and indicated that she should return in three months. On December 16, 2003, there was some swelling in the claimant's left hand. She complained of sensitivity near the carpal tunnel release scar, occasional headaches (about four since the last visit), and occasional pain in the mid back. Among her medications at the time were Bextra,

Ultracet, Zanaflex, and Topamax. Dr. Ahmed's diagnostic impressions were: post-surgical left carpal tunnel syndrome, possible reflex sympathetic dystrophy, chronic recurrent migraine headaches (improved), and chronic mid to low back pain without any significant change.

The next and final visit to Dr. Ahmed occurred on May 5, 2004, about a month before the hearing. At that time, the claimant complained of pain, weakness, numbness and swelling in her left hand; numbness in the middle finger and an inability to flex her fingers; wrist pain that radiated into her forearm; pain, tightness, and stiffness in her neck and left shoulder; and pain in the mid back. Dr. Ahmed diagnosed post-traumatic cervical strain; post-traumatic cervicogenic headaches/migraines that had worsened recently without medication; post-carpal tunnel release surgery with the possibility of reflex sympathetic dystrophy; and post-traumatic mid-back pain or strain. He related all of the conditions to the claimant's injury. Dr. Ahmed continued to prescribe Bextra and Ultracet. He also prescribed Relpax, noting that the claimant had complained of blurred vision for the first time since her injury and had attributed it to taking Topamax. However, he did not think the complaint had "anything to do with the medications." When deposed on May 12, 2004, Dr. Ahmed acknowledged that motor strength testing was normal as was an MRI of the claimant's cervical spine.

Dr. O'Neil, who is board-certified in plastic surgery, began treating the claimant for carpal tunnel syndrome in July, 2002, on referral from Dr. Ahmed. He received a history of the work-related fall and broken metacarpal bone. Although the bone had healed, she complained of numbness and difficulty closing the left middle and ring fingers. He noted decreased grip strength as well as other indications of carpal tunnel syndrome and restricted her to working one-handed. An EMG and nerve conduction

study confirmed the diagnosis. On February 11, 2003, he performed a left carpal tunnel release and a trigger release on the long finger of the left hand. He kept her off work for the second and third days post-op then released her to return to one-handed duty. On December 23, 2003, Mark Lindsey, an occupational therapist, assigned a 9% impairment rating and various restrictions.

When deposed on January 16, 2004, Dr. O'Neil testified that most patients improve dramatically after surgery but that the claimant's post-operative course was "somewhat different" because she continued to have pain and numbness at the incision. He ordered a repeat EMG in August, 2003. At that point the carpal tunnel symptoms had greatly improved, and most of the symptoms involved the ulnar rather than the median nerve. As of January 5, 2004, she continued to have a very sensitive scar, but the original numbness, tingling, and catching on the left long finger had resolved. He prescribed Lidoderm patches and Neurontin for the sensitivity.

Dr. O'Neil testified that he had attributed the carpal tunnel condition to the claimant's fall at work based on the history she related. He did not order tests on the right arm. When informed that Dr. Zerga had done so and they revealed evidence of carpal tunnel syndrome on the right side, Dr. O'Neil acknowledged that he wondered if the condition on the left side was due to something other than the fall. He stated that the first evidence of triggering occurred in December, 2002, that it was hard to know its cause, and that he was unsure of it. Asked to assign a permanent impairment, he stated that it would be in the range of 3 to 4 percent. He acknowledged that the claimant's subjective complaints outweighed the objective findings.

Dr. Rapier examined the claimant on August 18, 2003, at which time she complained of sensitivity on the surgical scar on her wrist, of tingling and numbness in

her left ring and little fingers, of an inability to touch her fingertips to the palm of her hand, and of a worsening of her symptoms with any use of the left hand. She also exhibited a limited range of motion in the hand. He noted the healing fracture of the left long finger metacarpal and the carpal tunnel and trigger finger surgeries, all of which he attributed to the fall at work. He assigned an 18% impairment, restricted the use of the left hand, and stated that the claimant lacked the physical capacity to return to the type of work she performed at the time of the injury.

Dr. Burgess evaluated the claimant on January 2, 2003, and again on October 2, 2003. On the initial exam she had a full range of motion in her hand but facial grimacing and withdrawal throughout the exam without any specific areas of pain, leading him to conclude that there was significant symptom magnification. He thought that a carpal tunnel release would likely relieve the numbness and tingling in her left hand but would not decrease her complaints of pain. As of October, 2003, the scar on her wrist appeared normal, and she had a full range of motion but had transferred her complaints of pain to the scar. He thought that she was falling into a chronic pain profile, that continuing physical therapy was unlikely to change her complaints, but that a Lidoderm patch to anesthetize the scar might help to break the pattern.

Dr. Zerga, a neurologist, evaluated the claimant on January 6, 2004. He received a history of the accident and subsequent complaints, reviewed her medical records, and performed a physical examination as well as EMG/NCV studies. He noted that numbness in the median nerve distribution had improved since the carpal tunnel surgery. Her present complaints involved the ulnar distribution of the left ring and little fingers, sensitivity over the carpal tunnel scar, and an inability to flex her middle and ring fingers. She also reported sensitivity in the dorsum of her left hand, but Dr. Zerga

could not verify it and noted only a mild decrease in flexion of the fingers. Range of motion was normal in the neck, shoulders, elbows, and wrists. Noting that a neurologist usually performed EMG and nerve conduction studies on both sides, he did so. The tests revealed bilateral carpal tunnel syndrome that was worse on the right, probably because surgery had been performed on the left. There was no evidence of a muscle spasm in the back and no evidence of tenderness, trigger points, atrophy, or fasciculation in any muscle group in the left upper extremity. When reporting the history he obtained, Dr. Zerga noted that the claimant took "Topamax, 100 mgs. at bedtime, apparently for her headaches." Subsequently, when summarizing the medical records, he noted that the claimant had complained of headaches to Dr. Ahmed but that "[s]he did not make that complaint today."

In Dr. Zerga's opinion, the accident caused a contusion producing headaches, neck pain, and back pain, all of which had resolved. He stated that nerve conduction studies revealed no ulnar neuropathy and that the present left hand symptoms had no anatomic explanation. An EMG of the left upper extremity revealed no evidence of proximal lesions or radiculopathy. Moreover, there were no findings of reflex sympathetic dystrophy (complex regional pain syndrome). He stated that the accident caused a metacarpal fracture that had healed and required no further medical treatment. He stated that the left carpal tunnel syndrome caused a 3% AMA impairment but that the condition was unrelated to the accident because it was bilateral. He restricted the claimant from highly repetitive work with her hands but imposed no other restrictions. Based on her description of her duties, he thought she could return to her job. In a February 18, 2004, supplemental report prepared after considering Dr. Ahmed's records as well as his own findings, Dr. Zerga stated that the claimant had "no

-6-

condition ratable for post-traumatic cervical strain, post-traumatic tension type headaches with superimposed migraine, or post-traumatic thoracolumbar strain," noting that she indicated on January 6, 2004, that the conditions had resolved.

Among other things, the parties stipulated that the claimant sustained a left metacarpal fracture and that the employer paid $12,797.04 in temporary total disability benefits and $50,966.94 in medical benefits. Among the matters at issue were whether the complaints other than the fracture were work-related and whether some unpaid medical bills from Dr. Ahmed were compensable. Persuaded by Dr. Zerga and the objective medical findings, the ALJ determined that the accident caused a fracture to the metacarpal bone, which had healed and required no further medical treatment, but that it did not cause the left carpal tunnel syndrome. The ALJ then stated as follows:

> I am persuaded by Dr. Zerga's opinion that any headaches, neck pain, and back pain which might be due to the work injury had resolved. I find, therefore, that none of the plaintiff's complaints other than the fracture of the left third metacarpal are causally related to her work injury of November 30, 2001.

On that basis, the ALJ determined that disputed medical bills were not compensable and that the injury caused no permanent impairment or disability. The claimant's petition for reconsideration was overruled, after which she appealed.

The claimant attacks Dr. Zerga's opinion that her headaches, neck, and back had resolved on the ground that it was based on an inaccurate history. She maintains, therefore, that the ALJ's decision regarding those conditions was not supported by substantial evidence and must be reversed. She argues that Dr. Zerga's statement that the conditions had resolved as of January 6, 2004, was mistaken. Pointing to Dr. Ahmed's December 16, 2003, report and to the symptoms she related when deposed on January 20, 2004, she asserts that the headaches and the neck, shoulder, and back

pain clearly were present on January 6, 2004. Therefore, Dr. Zerga's statement could not constitute substantial evidence. She also argues that it is clear from Dr. Zerga's supplemental report that he based his opinion that the headaches and the neck and back pain were not ratable conditions on his mistaken view of her history rather than his physical examination. Therefore, the opinion did not constitute substantial evidence.

A worker has the burden to prove every element of a claim. Roark v. Alva Coal Corporation, 371 S.W.2d 856 (Ky. 1963). A legal conclusion favoring the party with the burden of proof must be upheld if it is supported by substantial evidence. Special Fund v. Francis, 708 S.W.2d 641, 643 (Ky. 1986). If the party with the burden of proof does not prevail, that party's burden on appeal is to show that the favorable evidence was so overwhelming that no reasonable person could have failed to be persuaded by it. Id.

KRS 342.285 gives an ALJ the sole discretion to determine the quality, character, and substance of evidence. See Paramount Foods, Inc. v. Burkhardt, 695 S.W.2d 418 (Ky. 1985). In doing so, an ALJ may reject any testimony and believe or disbelieve various parts of the evidence. Caudill v. Maloney's Discount Stores, 560 S.W.2d 15, 16 (Ky. 1977). Where the evidence is conflicting, it is for the ALJ to choose whom and what to believe. Pruitt v. Bugg Brothers, 547 S.W.2d 123 (Ky. 1977). A worker's testimony is competent evidence of her physical condition, but an ALJ is not required to rely upon the testimony of an interested party even if it is uncontradicted. See, e.g., Ira A. Watson Dept. Store v. Hamilton, 34 S.W.3d 48, 52 (Ky. 2000); Grider Hill Dock, Inc. v. Sloan, 448 S.W.2d 373 (Ky. 1969). Likewise, a physician may base a medical opinion on a worker's statements regarding her symptoms, but nothing requires a physician to base an opinion on subjective complaints that are unsupported by the objective medical findings. See, Department of Economic Security v. Sizemore, 471

-8-

S.W.2d 733, 736 (Ky. 1971).

Dr. Zerga determined that the November 30, 2001, fall caused a contusion that produced headaches, neck pain, and back pain, but he differed from Dr. Ahmed regarding the status of those conditions in 2004. Contrary to the claimant's assertions, it is not at all clear that Dr. Zerga was mistaken about her complaints. It is apparent from Dr. Ahmed's notes that the frequency of her headaches had decreased dramatically by December 16, 2003. Dr. Zerga's initial report clearly indicates that he knew she had complained of headaches to Dr. Ahmed, but he noted that she did not mention them to him and concluded that they had resolved. On December 16, 2003, Dr. Ahmed noted only occasional back pain and did not mention neck pain. Dr. Zerga stated in his supplemental report that the claimant had indicated on January 6, 2004, that her neck and back symptoms had resolved. Moreover, his initial report noted a normal range of motion in the neck and upper extremity, the lack of evidence of a complex regional pain syndrome, the tests that indicated an absence of radiculopathy in the left upper extremity, and the absence of back spasm. When the claimant saw Dr. Ahmed in May, 2004, shortly before the hearing, she complained of numerous symptoms involving all three conditions. Under the circumstances, the ALJ was free to consider all of the evidence and to choose whom and what to believe.

The decision of the court of Appeals is affirmed.

All concur.

-9-

COUNSEL FOR APPELLANT:

Randy G. Clark
Clark & Johnson
P.O. Box 1529
Pikeville, KY 41502

COUNSEL FOR APPELLEE,
COMMUNITY TRUST BANK:

Ronald J. Pohl
Paul G. Richmond
Picklesimer, Pohl, Kiser & Aubrey, PSC
167 West Main Street, Suite 100
Lexington, KY 40507